Isadore D. BLUMENTHAL, Appellant,

v.

Leon REINER and wife, Bertha Reiner,
Appellees (two cases).

Leon REINER and wife, Bertha Reiner,
Appellants,

v.

Isadore D. BLUMENTHAL,
Appellee.

Nos. 7422, 7382, 7399.

United States Court of Appeals
Fourth Circuit.

Argued June 10, 1957.

Decided July 19, 1957.

Francis E. Winslow, Rocky Mount, N.
C., and Harold D. Cooley, Nashville, N. C.
(Hubert E. May, Cooley & May, Nash-
ville, N. C., and Battle, Winslow & Mer-
rell, Rocky Mount, N. C., on brief), for
Leon and Bertha Reiner.

Fred B. Helms, Charlotte, N. C., William H. Bobbitt, Jr., Raleigh, N. C., and Maurice A. Weinstein, Charlotte, N. C. (Weinstein & Muilenburg, and Helms & Mullis, Charlotte, N. C., on brief), for Isadore D. Blumenthal.

Before SOPER, SOBELOFF and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought by Leon Reiner and Bertha Reiner, his wife, of New York against Isadore D. Blumenthal of Charlotte, North Carolina, for the collection of two promissory notes aggregating $25,000.00 given by the defendant to the plaintiffs on January 23, 1951. The controversy arose out of a written contract dated October 1, 1948, wherein the Reiners sold and transferred 45 shares of the stock of L. and B. Reiner, Inc., a New York corporation, to Blumenthal for the sum of $190,000.00. The corporation had succeeded a partnership composed of the Reiners in the business of distributing and servicing surgical and medical requirements for a large part of the United States. The parties had known each other for many years and each of them had had extensive experience in the business world. A total of 90 shares of stock of the corporation were outstanding, so that by reason of the contract the Reiners and Blumenthal each owned a one-half interest in the enterprise. In payment for the stock, Blumenthal gave $50,000.00 in cash and twenty promissory notes in the aggregate sum of $140,000.00 payable over a period of ten years. The stock was deposited as collateral security for the payment of the notes. The Reiners became the president and secretary-treasurer, respectively, and Blumenthal the executive vice-president of the corporation.

The enterprise had been a profitable one but after 1948 the volume of the business and the profits steadily decreased and Blumenthal became dissatisfied with the bargain and did not pay the notes as they fell due. Some conferences between the parties took place and finally the parties reached a compromise during a visit of Blumenthal to New York. During this visit he was served with a summons in an action brought by the Reiners on the past due promissory notes in the Supreme Court of the State of New York. This suit, however, was dismissed when the parties signed an agreement of settlement on January 23, 1951, under which the two promissory notes in suit, one for $10,000.00 payable November 15, 1951, and one for $15,000.00 payable November 15, 1952, were given.

The pending controversy depends upon the construction of this agreement. The preamble referred to the sale of the stock under the prior contract of October 1, 1948, recited that the sum of $158,900.00, representing the balance of the purchase price of the stock with interest remained unpaid, and set out the desire of the parties to amend that agreement.

The body of the new agreement contained the following provisions:

Section 1 terminated and cancelled the agreement of October 1, 1948.

Section 2 declared that the unpaid balance of $158,900.00 of the purchase price of the stock should be paid as follows:

(a) Simultaneously with the execution of this agreement, Blumenthal will pay to Leon Reiner and Bertha Reiner jointly the sum of $25,000.00.

(b) Simultaneously with the execution of this agreement, Blumenthal will execute and deliver to Leon Reiner and Bertha Reiner two (2) promissory notes payable to their order with interest at three (3%) per cent per annum as follows: one note in the face amount of $10,000.00 payable on November 15, 1951 and one note in the face amount of $15,000.00 payable on November 15, 1952. Said notes shall provide that in the event the note first due is not paid on its due date, then the second note shall forthwith become due and payable.

(c) In the event of a default in the payment of either of the aforesaid notes, Leon Reiner and Bertha Reiner jointly shall forthwith be deemed to have purchased the said forty-five (45) shares of stock now owned by Blumenthal in the same manner as if an offer to sell the same had been made by Blumenthal at the book value thereof. The obligation of Blumenthal to pay the amounts set forth in said notes, together with interest, shall nevertheless survive, Blumenthal shall continue liable therefor and Leon Reiner and Bertha Reiner may institute any action at law or otherwise to enforce collection of same.

(d) The balance of $108,900.00 with interest at three (3%) per cent from the date hereof shall thereafter be payable only out of dividends paid on the corporate stock now owned by Blumenthal, corporate salaries and bonuses or any other sums, if any, that may become due or payable to Blumenthal from the corporation. Blumenthal does hereby authorize the Corporation to pay over to Leon Reiner and Bertha Reiner jointly all such dividends, salaries and bonuses or any other sums, if any, that may become due and payable to him at any time on or prior to September 1, 1958, to be applied against said balance of $108,-900.00 until the same, plus accrued interest at three (3%) per cent, has been fully paid and discharged. If any balance, as aforesaid, remains unpaid on September 1, 1958, Blumenthal does hereby sell, transfer and assign the forty-five (45) shares of the corporate stock now owned by him to Leon Reiner and Bertha Reiner jointly, the purchase price to be the amount of said balance which shall be credited in full payment of said balance and said shares shall be and become the sole property of Leon Reiner and Bertha Reiner without any right of redemption thereto in Blumenthal with the same

force and effect as if Blumenthal had offered the same for sale to Leon Reiner and Bertha Reiner at the amount of said balance and Leon Reiner and Bertha Reiner had accepted said offer.

(e) In the event of a dissolution or liquidation of the Corporation, any sums that may become due and payable as a result thereof on the shares of corporate stock now held by Blumenthal, are hereby assigned to Leon Reiner and Bertha Reiner jointly to apply against the balance of $108,500.00 with interest as aforesaid and only the surplus, if any, shall be delivered to Blumenthal.

3. Pending payment in full of the balance as aforesaid, Leon Reiner and Bertha Reiner shall hold said forty-five (45) shares of corporate stock now registered in the name of Blumenthal as collateral security for the payment of said sum.

The decision in this case turns primarily on the interpretation of the foregoing sections of the agreement. A strong light, however, is thrown upon their meaning by subsequent provisions of the contract. Amongst other things, Section 5 declared the intent of the parties to maintain the capital of the corporation for any losses sustained during each year until September 1, 1958, by making loans to the corporation whenever it should need additional working capital. The contributions were to be made in accordance with respective stock interests of the parties and each party agreed to pay his proportionate share of the loss during any six months' period within fifteen days after notice of the amount of the loss as determined by the corporation's accountants; and it was provided that if Blumenthal should fail to pay the amount required of him in such case within ten days, this should be deemed an acceptance by the Reiners of an offer by Blumenthal to sell his shares to the Reiners at the book value thereof. The agreement further provided that Leon Reiner would receive a

salary of $15,000.00 a year and that Blumenthal and Bertha Reiner would receive equal salaries in amounts fixed by the Board of Directors. There were also provisions for giving the Reiners first opportunity to buy the Blumenthal stock in case he should determine to sell; provision for the ascertainment of the book value of the stock; provisions for the acquisition of the stock by the survivors in case of the death of one of the parties to the agreement; and, finally, provision for the execution by the parties of formal instrument releasing all of the parties from all obligations other than those contained in the agreement. Such releases were actually executed.

Blumenthal paid the sum of $25,000.00 in cash to the Reiners, and gave his notes for $25,000.00 as provided by the agreement; but the subsequent period of joint operation of the corporation, which was obviously contemplated to last at least until September 1, 1958, shortly came to an abrupt end. Prior to November 15, 1951, when the note for $10,000.00 came due, Blumenthal notified the Reiners that he would not pay the two notes, and on that date actually defaulted in the payment of the first note. In the meantime, no reduction in the balance of the indebtedness in the sum of $108,900.00 had been made since no dividend had been declared by the corporation—and no salary or bonus had been paid or become due to Blumenthal. Thereupon the Reiners, in accordance with provisions of Section 2(c) of the settlement agreement, took over the 45 shares of Blumenthal's stock as purchasers. The book value of these shares at that time, according to the stipulation of the parties, was $55,949.70. After this default the present litigation ensued.

The Reiners brought suit in the District Court below upon the two promissory notes, the second note having become due under the agreement by reason of default on the first, and claimed judgment for $10,000.00 with interest at 3 per cent from January 3, 1951 until November 15, 1951, on the first note, and thereafter at the interest rate of 6 per cent until paid; and also judgment for $15,000.00 with interest at the rate of 3 per cent up to November 15, 1952, on the second note and thereafter interest at the rate of 6 per cent.

The defendant filed an answer denying liability for the amounts claimed in the complaint and filed three counterclaims. In the first counterclaim it was alleged that L. and B. Reiner, Inc. was never validly incorporated, in that the corporation did not have at least three directors and three stockholders as required by the laws of the State of New York and hence no capital stock of the corporation was ever validly issued and, therefore, the representations by the plaintiffs that the corporation was duly organized were false and fraudulent, whereby the defendant was deceived and induced to purchase 45 shares of the alleged stock. It was also alleged in the counterclaim that the plaintiffs had made certain representations as to the volume of business of the corporation which were false and made with the intent to defraud the defendant and induce him to purchase the stock, and that the stock was purchased on the faith of these fraudulent representations; and also that the plaintiffs had grossly mismanaged the affairs of the corporation so that it suffered heavy losses. In consequence, the defendant claimed that the plaintiffs were indebted to him for the sum of $75,000.00, being the cash sums that he theretofore paid for the stock.

The second counterclaim was based on the allegation that through the foregoing circumstances the defendant was induced through the fraudulent acts and representations of the plaintiffs to execute the promissory notes in suit with the result that recovery on those notes were barred and the plaintiffs became indebted to the defendant for the sum of $75,000.00.

The third counterclaim sought the recovery of the sum of $32,645.00 from the plaintiffs, representing the difference between the alleged book value of the stock in the sum of $57,645.08 on November

15, 1951, and the aggregate sum of the two promissory notes of $25,000.00. The answer of the plaintiffs to the counterclaims set up denials of the pertinent allegations and denied liability.

The case came on for trial before the District Judge and jury and each party filed a motion for a directed verdict. In fact, it was agreed that the case was one for peremptory instruction by the Judge. The District Judge was in accord with this position. He refused to submit to the jury any issue with reference to the counterclaims of the defendant, thereby ruling that there was no evidence to support them. He submitted two issues to the jury with respect to the plaintiffs' suit on the notes: (1) whether the notes were executed and were in default and (2) as to what amount, if any, the defendant was indebted to the plaintiffs. However it was agreed by the parties that the answer to the first question should be "Yes", and the Judge directed the jury to answer the second question with the word "Nothing", so that in effect a peremptory instruction in favor of the defendant was given and the judgment to this effect was entered. Subsequently, after careful re-examination of the case, on motion by the plaintiffs under Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the Judge entered judgment n. o. v. for the plaintiffs for the amount due on the two promissory notes with interest at 3 per cent from the date of the note to the date of judgment. The defendant appeals (1) from the judgment in favor of the plaintiffs on the promissory notes, case No. 7422; and (2) from the judgment in favor of plaintiffs on defendant's counterclaims, case No. 7382; and plaintiffs appeal from the provision of the judgment in their favor on the promissory notes limiting the interest to 3 per cent between the due date of the notes and the date of the judgment, case No. 7399.

The principal controversy in the case relates to the application of the sum of $55,949.70, the stipulated value of the stock deposited as collateral. On the part of the plaintiffs it is contended that the value of the stock should be applied against the balance of the debt ($108,-900.00) remaining due after crediting the cash payment of $25,000.00 and the promissory notes of $25,000.00 that were given in the settlement of January 23, 1951. Under this interpretation the balance of the debt is reduced from $108,-900.00 to $52,950.30 since the payment of the balance was to be made only out of moneys which should become payable to Blumenthal by the corporation prior to September 1, 1958, and this source of income has been cut off by the transfer of Blumenthal's stock to the Reiners and his complete severance from the business. On the other hand, the defendant contends that the book value of the stock should be applied entirely to the indebtedness of $25,000.00 due on the notes with the result that the defendant is entitled to a judgment against the plaintiffs in his favor on his third counterclaim in the sum of $30,949.70, the excess of the purchase price of the stock over the amount due on the notes. Under this theory the defendant would be relieved from the entire obligation to pay the balance of the indebtedness of $108,-900.00. In our view, the interpretation placed upon the agreement by the plaintiff, which was finally approved by the District Judge, is correct and must be sustained.

The situation of the parties at the time of the settlement of January 23, 1951, as disclosed by the undisputed evidence, was such that the interpretation of the defendant cannot reasonably be entertained. At that time Blumenthal was under an absolute obligation to pay to the Reiners the sum of $158,900.00 with interest on his unpaid promissory notes in accordance with the agreement of October 1, 1948. But the business in which he had purchased the one-half interest had not been as profitable as he expected and so he prevailed upon the Reiners, his long time acquaintances, to relieve him from his obligation and to give him more favorable terms. By the new arrangement the balance of $158,-

900.00 due by him under the 1948 agreement was reduced to $108,900.00 through the payment by him of $50,000.00 made up of $25,000.00 in cash and $25,000.00 in notes; and the absolute obligation to pay the balance of $108,900.00 was reduced to a contingent liability measured by the moneys which he would thereafter receive in dividends, salaries and bonuses in the interval between January 23, 1951 and September 1, 1958, a period of seven and three-quarter years.

Obviously the parties contemplated joint operation of the business for an extended period. It was agreed not only that Blumenthal's dividends and compensation should be applied to the balance of the indebtedness until September 1, 1958, but also that in the meantime he would cooperate with the Reiners in making loans to the corporation if it should become necessary to do so in order to furnish it with adequate working capital. Provision, however, was carefully made for restricting Blumenthal's liability in the event he should fail to keep his promises, either to pay the notes aggregating $25,000.00 or to make the loans to the corporation as above described. In either case, the stock was to be bought by the Reiners at its book value and his connection with the enterprise would automatically terminate. It was also provided that if any balance of the debt of $108,900.00 should remain unpaid on September 1, 1958, the stock would be transferred to the Reiners and accepted as full payment of the balance due. But this was not all. Although the possibility of defaults on Blumenthal's part were contemplated, he was not at liberty to repudiate his promises at will, and it was specifically provided in Section 3 of the contract that pending payment in full of the balance due, in the sum of $108,900.00, the Reiners should hold the Blumenthal stock as collateral security for the payment thereof.

Keeping these facts in mind it is seen that the defendant's position is untenable. He contends that immediately upon the execution of the agreement of January 23, 1951, it lay within his power, by the simple device of declaring a default on the promissory notes, not only to wipe out the balance of the debt of $108,900.00, but also to nullify completely the clause that the stock should be held as collateral security for the payment thereof. Thus instead of owing $25,000.00 absolutely, and $108,900.00 contingently secured by the stock as collateral, he would owe only $25,000.00 on the notes and would become the seller of the stock at the book value of $55,949.70, leaving a balance in his favor of $30,949.70.

Such a result could not possibly have been contemplated by the parties. They had just entered into a compromise settlement which substantially lightened the obligations of Blumenthal under the earlier agreement but obligated him, nevertheless, to maintain his connection with the enterprise and allowed the Reiners to retain his stock as collateral security for the payment of the balance of the debt. It is inconceivable in this situation that they intended to put it in his power immediately to destroy the only security which the Reiners had for the performance of this obligation. Two important factors must be kept in mind throughout the discussion: (1) that it was expressly agreed in Section 2(c) of the new agreement that, although upon default the Reiners would purchase the stock of Blumenthal, nevertheless, his obligation to pay the amount of the notes would survive; and (2) that the Blumenthal stock was not held as collateral security for the payment of the notes, but, as collateral security for the payment of the balance of the debt in the sum of $108,900.00 under the terms of Section 3 of the agreement. This provided that the collateral should be held as security for the payment "of the balance aforesaid", which is described in Sections 2(d) and 2(e) as "the balance of $108,900.00".

The defendant's position is tenable only if attention is confined to the provisions of Section 2(c) of the agreement and the provisions of 2(d) under Section 3 are entirely ignored. Under the latter

sections Blumenthal could have retained his interest in the corporation and devoted the moneys received from it to the payment of the balance of the debt until September 1, 1958, whereupon it would have been automatically paid in full by the transfer of the Blumenthal stock to the Reiners, whatever its value at that time. But Blumenthal was unwilling to take this course. To the contrary, for purposes of his own, he gave up his stock in the corporation, severed his connection with the business, destroyed the only source from which the payment of the balance of his debt could be made, and refused to carry on as he had agreed. Undoubtedly he had the power under the agreement to take this course, but it nevertheless amounted to a default in the payment of the debt and justified the application of the collateral, as far as it would go, to its liquidation. Unless Section 3 of the agreement is given this effect upon the default of Blumenthal prior to September 1, 1958, it has no meaning at all.

The defendant argues that the terms of the agreement are ambiguous and therefore should have been submitted to the jury for their interpretation. We think, however, that the agreement is not ambiguous and agree with the position taken not only by the plaintiffs but by the defendant himself in the trial below, that the question was to be determined by the Judge.

There is no substance in the additional defenses and counterclaims of the defendant, under which it is asserted that the initial agreement was vitiated by fraudulent representations of the Reiners upon which Blumenthal relied; and, also, that the shares of stock in Blumenthal's name were invalidly issued because the corporation was organized with less than three stockholders and three directors and therefore never came into existence. The defendant, however, did not offer to show in what way he was deceived regarding the volume of the corporate business and there is no reason to believe that he did not know the pertinent facts as to the enterprise in which he was purchasing a one-half interest.

█ The facts as to the incorporation of the business seem to be that the two Reiners, and a third person who was the nominal owner of a single share of stock participated in the organization of the corporation, but afterwards the third person transferred the share to the Reiners. No New York decisions are cited in support of the contention that under such circumstances the corporation had no existence; but, in any event, the point is lacking in substance, since there is nothing to show that the Reiners did not endeavor in good faith to form a valid corporation and, more particularly, nothing to show that Blumenthal failed to get substantially what he intended to buy, or that he suffered any loss by reason of any imperfection in the corporate setup. Even if it be conceded that the corporation did not come into being, it is nevertheless true that Blumenthal purchased an interest in a business belonging to the Reiners, which he has now disposed of, and that, in the meantime, he has suffered no detriment by reason of the fact that he purchased an interest in a partnership rather than in a corporation, if such be the fact.

█ The cross-appeal of the Reiners is based upon the contention that the District Judge was in error in allowing only 3 per cent interest on the notes from January 23, 1951, until the date of judgment and 6 per cent thereafter. It is said that the court should have allowed interest at the legal rate of 6 per cent per annum prevailing in North Carolina from the date of default to the date of judgment. The amount involved is approximately $4,000.00. It is conceded that the inquiry should be directed to the intention of the parties as manifested in the contract and that the North Carolina law governs, since it is well settled that, where interest is due for the failure

to pay a note which is made in one place but is to be paid in another, the law of the place of payment governs the rate. See 11 Am.Jur., Conflict of Laws, § 162. In the present instance the matter is not difficult of determination because the rate of interest was specifically provided in the notes themselves and also in Sections 2(b) and 2(c) of the agreement of settlement. In the latter it was provided that the notes should be payable with interest at 3 per cent per annum and that in case of default the Reiners would become the purchasers of the stock, but the obligation of Blumenthal "to pay the amounts set forth in said notes, together with interest, shall nevertheless survive". The inference is irresistible that the amount of interest to be paid after default was at the rate of 3 per cent as set forth in the preceding paragraph of the agreement. It is worthwhile to recall in this connection that under the original agreement of October 1, 1948, the Blumenthal indebtedness carried interest at the rate of 6 per cent, so that the reduction of the rate of interest to 3 per cent in the compromise agreement was clearly one of the concessions made to the debtor in order to lessen the burden of what had turned out to be an unfortunate contract on his part. The settlement, as we have seen, made express provision for the rights and obligations of the parties that would ensue in the event of a subsequent default by Blumenthal, and one of the provisions was that the obligation of Blumenthal to pay the notes, "together with interest," should nevertheless survive. We think the parties must have had in mind the specified rate of 3 per cent and not the legal rate of 6 per cent which prevails in North Carolina. See Womble v. Little & Mordecai, 74 N.C. 255; Pass v. Shine, 113 N.C. 284, 18 S.E. 251; Wadesboro Cotton Mills Co. v. Burns, 114 N.C. 353, 19 S.E. 238.

The judgment of the District Court is

Affirmed.